IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
May 9, 2017 Session

## JAY DEE GARRITY v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Davidson County**
**No. 2009-C-2411     Monte Watkins, Judge**

_____

### No. M2016-01463-CCA-R3-PC

_____

The Petitioner, Jay Dee Garrity, appeals the Davidson County Criminal Court's denial of his petition for post-conviction relief from his convictions of three counts of aggravated sexual battery and resulting effective forty-eight-year sentence to be served at 100%. On appeal, he contends that he is entitled to a new trial because trial counsel was presumptively ineffective under United States v. Cronic, 466 U.S. 648 (1984). In the alternative, he contends that he received the ineffective assistance of counsel under the usual Strickland standard. Based upon the oral arguments, the record, and the parties' briefs, we conclude that the Petitioner received the ineffective assistance of trial counsel under Strickland. Therefore, the judgment of the post-conviction court is reversed, the judgments of conviction are vacated, and the case is remanded for further proceedings consistent with this opinion.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Reversed,**
**Convictions Vacated, and Case Remanded**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which ALAN E. GLENN and ROBERT H. MONTGOMERY, JR., JJ., joined.

Jessica Marie Van Dyke, Nashville, Tennessee, for the appellant, Jay Dee Garrity.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Counsel; Glenn R. Funk, District Attorney General; and Roger Moore, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### I.  Factual Background

This case arose from reports that the Petitioner sexually abused his stepdaughter, B.L., while they lived in Nashville from 1996 to 1999. The family moved to Oklahoma in 1999, and the Petitioner and the victim's mother separated in 2003. The victim revealed the abuse to her mother in June 2006 and to Oklahoma police in 2007.

In August 2009, the Davidson County Grand Jury indicted the Petitioner for three counts of aggravated sexual battery of a child less than thirteen years old, a Class B felony. The indictment alleged that the offenses occurred more than ten years earlier, between August 1, 1997, and March 1, 1999.

On September 13, 2010, the Petitioner signed a written waiver of his right to a jury trial, and the trial court proceeded with a bench trial. In its direct appeal opinion affirming the Petitioner's convictions, this court gave the following factual account of the trial:

> During the State's opening statement, defense counsel objected to the State discussing the possible testimony of a family member named Betty Sue Blalock. Defense counsel claimed that the State failed to adequately inform the defense about the identity of this witness and the information to which she might testify. The State responded,
>
> > Judge, respectfully, that is a completely disingenuous statement of the facts. I told [defense counsel] probably two months ago about this witness. I gave him her name as I knew it at the time. I asked[ ] Mr. Halstead to add her to the indictment. And I told [defense counsel] precisely last week exactly what she would be testifying to, that she would be here this weekend if he wanted to talk to her.
>
> Defense counsel responded that he received the witness's name only the week before trial. Because of the short notice, defense counsel asserted that he did not have sufficient time to investigate possible attacks to her credibility. The trial court stated, "I am going to allow the [State] to continue on with her opening statement. . . . I'll allow you the opportunity to speak with this potential witness." Defense counsel acknowledged that the State already had given him the opportunity to meet with the potential witness prior to the start of the trial.
>
> The mother of the victim ("Mother") testified at trial that the Defendant is her ex-husband. She married the Defendant in 1993 and divorced him approximately one year before trial. In 1996, Mother and the Defendant moved from Oklahoma to Nashville along with her son, S.R., and daughter, B.L. While in Nashville, Mother's job kept her from being

able to pick up the kids from school. As a result, S.R. would ride the bus home, and the Defendant would pick up B.L., who was six years old in 1996. Over time, Mother noticed that the Defendant spent more time with B.L. and seemed to push S.R. away. The Defendant took B.L. with him anywhere he went, even if he only was going out to buy a pack of cigarettes. This behavior continued once the family moved back to Oklahoma in 1999. Most nights, when Mother returned home, S.R. would be out playing with friends, and the Defendant and B.L. would be alone together.

Mother stated that while living in Nashville her brother stayed with her family for approximately a month. When her family moved back to Oklahoma in 1999, her brother lived with her family again for an extended period of time.

During the latter part of their time in Nashville, they lived in the Burning Tree Apartments. Mother and the Defendant shared a room and bathroom, and each of the kids had their own bedroom and shared a bathroom. Mother and the Defendant separated in 2003. Around 2006, Mother tried to locate the Defendant for the purpose of finalizing their divorce. As she searched the internet, something caught her attention, and the thought struck her that the Defendant possibly had sexually abused B.L. When Mother picked up B.L. from school later that day, she asked B.L. if the Defendant ever had touched her or acted inappropriately. Mother stated, "[B.L.] turned her head and looked out the window and was quiet. And when she turned back around, tears were just streaming, and she said yes." Mother pressed B.L. for more information, but, initially, B.L. was reluctant to provide details. Sometime in the next six months, Mother received a phone call from the Defendant. Mother and B.L. picked up two different receivers, and Mother "told him [she] knew what he did." According to Mother, the Defendant responded, "[B.L.] is a liar." The Defendant also claimed that it was Mother's brother and not him who was responsible. After this phone conversation, Mother initiated criminal charges against the Defendant in Oklahoma.

B.L.[, who was twenty years old at the time of trial,] testified that when they were living in Nashville, she had learned a saying at school: "Chinese, Japanese, dirty knees, look at these." She had gotten in trouble for repeating the saying to Mother and the Defendant. Approximately a week later, the Defendant picked up B.L. from school and asked her to repeat the saying that she had learned. He asked her to lift up her shirt, and he proceeded to touch her breasts. B.L. stated that this occurred in their living room. The Defendant later told her that her saying that phrase gave

him the idea to touch her, and, accordingly, she felt responsible for his actions. On a different occasion, the Defendant lifted B.L.'s shirt and touched her breasts after calling her into his bedroom to take a "nap." According to B.L., he also "unzipped his pants and pulled them down" and "touch[ed] his genitals." She testified that his touching her breasts happened "repeatedly" or "almost every day." On a third occasion, the Defendant asked her to come into the bathroom. He already was in the bathroom with the door closed. When she entered, she realized that he was naked. He put his hand on hers and "had [her] rub his penis." In all the instances that occurred in Nashville, she did not remember the Defendant ejaculating.

B.L. testified that the Defendant continued to touch her breasts and masturbate after they moved from Nashville until she was thirteen years old. Initially, B.L. stated that she and the Defendant were always home alone when the Defendant would touch her. On cross-examination, however, she remembered one instance in which the Defendant touched her in his bedroom while family members were in the kitchen.

B.L. stated that the Defendant warned her not to tell anyone or that he would say it was B.L.'s uncle or brother. B.L. also was afraid that her mother would not believe her. Thus, she didn't tell Mother until she was fifteen years old. She stated, "She had picked me up from school, and we were on our way back to her job. And she had asked me again if [the Defendant] had ever touched me. And I stood silent for a couple of minutes, and then I finally said yes. And then she just started crying." B.L. also testified about the time that the Defendant called the house after she told her mother of his touching her. According to B.L., Mother said, "I know what you did to her," and the Defendant responded, "Did what? I didn't do nothing. It was [your brother]."

The State called Betty Sue Blalock to testify. The defense renewed its objection regarding the trial court allowing this witness to testify. Defense counsel stated, "I did get an opportunity to speak with [Blalock], Your Honor. I've had absolutely no opportunity to do anything else, what I would normally do with a witness if I knew the information." The trial court responded, "I am going to allow her to testify if you've had an opportunity to speak with her."

Blalock testified that she is related to Mother by marriage. She lives in Oklahoma near the area where Mother now lives. She remembered visiting Mother on one occasion when Mother and her family lived in Nashville. She was sitting at the kitchen table with B.L., the Defendant,

Blalock's husband, and Mother's brother. According to Blalock, the Defendant said to B.L., "Come on, [B.L.], it's time to take a nap. Come on, you've got to take a nap." Blalock asked the Defendant why B.L. needed to take a nap. The Defendant responded that they would not be able to stand being around B.L. if she didn't take a nap. Then the Defendant and B.L. went into the Defendant's bedroom and closed the door. Blalock believed that B.L. was approximately eight years old at that time. Neither Mother nor S.R. were at home when this incident occurred.

Detective Rachel Black, Metro Police Department sex crimes division, testified that she became involved in the investigation of this case following reports provided by a police department in Oklahoma. Detective Black requested the case file from Oklahoma but received only a summary sheet of less than one page and a video containing a forensic interview of B.L.

The State submitted the following as its election of offenses:

Count 1 Aggravated Sexual Battery - refers to the first incident the victim can recall of the defendant fondling her breasts shortly after she'd been punished for reciting the rhyme "Chinese, Japanese, Dirty knees, Look at these." This incident occurred in the living room in the family's apartment at Burning Tree Apartments in Hermitage.

Count 2 Aggravated Sexual Battery - refers to an incident wherein the defendant fondled the victim's breasts in the defendant's bedroom after telling her to come in the bedroom for a "nap." This incident occurred in the master bedroom in the family's apartment at Burning Tree Apartments in Hermitage.

Count 3 Aggravated Sexual Battery - refers to an incident of the defendant forcing the victim to masturbate his penis with her hand after calling her into his bathroom. This incident occurred in the master bathroom in the family's apartment at Burning Tree Apartments in Hermitage.

The Defendant did not testify and offered no proof. The trial court deliberated and returned a verdict of guilty on all three counts of aggravated sexual battery.

State v. Jay Dee Garrity, No. M2010-02592-CCA-R3-CD, 2012 WL 3939349, at *1-4

(Tenn. Crim. App. at Nashville, Sept. 11, 2012) (footnotes omitted), perm. app. denied, (Tenn. May 14, 2013).

After a sentencing hearing, the trial court sentenced the Petitioner as a Range II offender to three consecutive sentences of sixteen years to be served at 100%. On direct appeal of his convictions to this court, the Petitioner alleged that the trial court erred by allowing "'surprise witness'" Betty Sue Blalock to testify, that the evidence was insufficient to support the convictions, and that his effective forty-eight-year sentence was excessive. Id. at *1. This court affirmed the Petitioner's convictions but remanded the case for resentencing in conformity with Blakely v. Washington, 542 U.S. 296 (2004), Cunningham v. California, 549 U.S. 270 (2007), and State v. Gomez, 239 S.W.3d 733 (Tenn. 2007). Id. at *11. In December 2012, the trial court again sentenced the Petitioner to three consecutive sentences of sixteen years to be served at 100%.

The Petitioner filed a timely petition for post-conviction relief, alleging that he received the ineffective assistance of trial counsel, and the post-conviction court appointed counsel. In the Petitioner's amended petition, he alleged that he received the ineffective assistance of counsel, in pertinent part, because trial counsel failed to investigate his case adequately; failed to investigate his work schedule to refute the victim's allegations; failed to speak with Oklahoma police to verify the victim's mother's anticipated testimony; failed to provide advice about the merits of a bench trial versus a jury trial; failed to meet with him before trial to discuss all possible defenses and whether he should testify; and failed to cross-examine key witnesses about critical discrepancies and prior inconsistent statements.

At the evidentiary hearing, trial counsel testified that he was appointed to represent the Petitioner after the Petitioner's arraignment because the Petitioner's previous attorney had to withdraw. Trial counsel represented the Petitioner for one to one and one-half years before the Petitioner went to trial. The case involved allegations by the Petitioner's step-daughter, "who had accused him of something similar in Oklahoma." The alleged sexual conduct in Nashville occurred prior to the alleged sexual conduct in Oklahoma, but the victim did not make any allegations until after she had moved to Oklahoma. By that time, the Petitioner lived in another state. However, he returned to Oklahoma for court and "got convicted of something" there. Post-conviction counsel asked if trial counsel remembered that the Petitioner entered a nolo contendere plea in Oklahoma, and trial counsel answered, "No. I -- what I recall was that he got some kind of a probation deal." Trial counsel said the case then "emerged here in Nashville, where she alleged that he had had sexual contact with her a couple of different times." Trial counsel said that what "stood out" about this case was that the Petitioner spent a lot of time with the victim and that "there were some family members who had some concerns about how closely he had contact with his step-daughter."

Trial counsel identified a transcript of a police interview with the victim that was

part of the Oklahoma case and a transcript of the Petitioner's preliminary hearing in Oklahoma, and post-conviction counsel moved to admit the transcripts into evidence. Trial counsel said he had the police interview transcript while he was preparing for trial but did not remember if he had the preliminary hearing transcript. He said he met with the Petitioner "a few" times in jail but did not remember exactly how many times. Post-conviction counsel showed him a notarized copy of the Petitioner's attorney visitation log for the Davidson County Jail. Trial counsel acknowledged that the log showed he visited the Petitioner only one time and that the visit occurred on September 9, 2010.[1] He said, though, "I just recall that it was more than one." The Petitioner and trial counsel also met during the Petitioner's "[h]alf a dozen court dates," but the meetings never lasted more than fifteen minutes. Trial counsel said he thought the Petitioner also telephoned him from jail a few times.

Trial counsel testified that he and the Petitioner talked about the Petitioner's prior criminal history but that trial counsel "was much more concerned with the Oklahoma situation part of his record, because of the close relationship it had to this case." Trial counsel contacted the victim, but she would not speak with him. He spoke with the victim's mother and at least one other family member, though. He also talked with either the prosecutor or defense counsel in the Oklahoma case and thought he talked with an Oklahoma detective. Trial counsel said that he commonly hired an investigator in "a serious case like this" but that he did not specifically remember hiring an investigator in the instant case.

Trial counsel testified that the defense's theory was that the Petitioner "didn't do it." The Petitioner insisted he did not abuse the victim, and he and trial counsel talked about inconsistencies in the victim's stories. Trial counsel said that one of the inconsistencies "had to do with something about it couldn't have happened in this time period because they weren't living in the house that she described at the time" and that trial counsel's strategy was to point out the victim's inconsistencies. Trial counsel said he also "[tried] to get records about when [the Petitioner] was working . . . to see if it matched up with her story about when things happened." Trial counsel did not remember if he actually obtained the Petitioner's employment records but said he would have used them at trial "if they [had] indicated [the Petitioner] was working out of town during that time period that she claims these things happened."

Trial counsel testified that he told all of his clients they were entitled to a jury trial or could have a bench trial. The Petitioner had seen Judge Monte Watkins in court and thought Judge Watkins "would be a good judge to have a trial in front of, and thought that twelve people that were strangers to the system could hurt his case, they might not understand as well." Trial counsel said that he would have explained the "pros and cons" of having a bench trial with the Petitioner and that he specifically remembered doing so

---

[1] According to the log, the visit lasted forty-five minutes.

in this case "because it's pretty rare to have a bench trial." He stated that the Petitioner thought "a judge might remember the threshold being beyond a reasonable doubt" and that he agreed with the Petitioner. Trial counsel said that he had tried four cases involving allegations of sexual conduct with a child but that the Petitioner's case was the only bench trial. Trial counsel was sure the Petitioner signed a written waiver of his right to a jury trial. Post-conviction counsel asked if trial counsel had any "major life events going on" when the Petitioner went to trial in September 2010, and trial counsel said no.

Trial counsel acknowledged that if a defendant was going to testify at trial, then the defendant needed to be prepared in advance. He stated, "I explain the questions that I am going to ask. Going to explain what questions I expect the State is going to ask; and make sure that, not only, are his answers truthful but they're consistent with what he's said previously." Trial counsel said that he did not specifically remember having conversations with the Petitioner about whether the Petitioner should testify but that "I know that we had them, I just don't remember what we said then." The Petitioner was "certain" he did not need to testify.

On cross-examination, trial counsel testified that he had been licensed to practice law twenty years and that ninety-eight percent of his practice involved criminal law. The Petitioner was a Range II, multiple offender, and trial counsel did not want a jury to know that the Petitioner had been convicted in Oklahoma. Trial counsel acknowledged that if the Petitioner had testified at trial, a judge would not "necessarily [be] awed" by the Petitioner's criminal history. He also acknowledged that it was the Petitioner's decision not to testify in this case. The Petitioner was cooperative, and trial counsel did not have any problems with him.

Trial counsel acknowledged that his job at trial was to create doubt in the victim's credibility. The Petitioner did not believe he was present for all of the incidents alleged by the victim. However, the victim was "so general" about when the offenses occurred that trial counsel could not prove the Petitioner was out of town at the time of the incidents. Trial counsel objected to Blalock's testifying at trial, and he raised the issue on direct appeal of the Petitioner's convictions.

On redirect examination, trial counsel identified a five-page supplemental report written by Metro Police Detective Rachel Black. The report contained summaries of discussions Detective Black had with the victim and the victim's mother. Trial counsel said that he received discovery in this case and that he usually asked for "Jencks" material after a witness testified. However, he did not recognize Detective Black's report. Post-conviction counsel asked if he would have used the report to cross-examine the witnesses, and he answered, "Possibly . . . . But we had already developed a few inconsistencies and these might have been included in them. I'm not sure."

Trial counsel testified that he did not think the Petitioner would do well on cross-

examination at trial. Trial counsel did not know if he "role-played" with the Petitioner in anticipation of the Petitioner's trial testimony, but he said they talked about the questions the prosecutor would ask.

The Petitioner testified that he met the victim and her mother in Oklahoma when the victim was three years old. He married the victim's mother in 1993, and they had known each other for just a few months when they married. They moved to Tennessee in 1996 and lived there less than three years. In February 1999, the family moved back to Oklahoma. The Petitioner's relationship with the victim's mother ended in 2003, and he moved to Ohio. He stated that he tried to "revive" their relationship and that "I sent her three to five hundred dollars every week for a year after that, trying to get her to move to Ohio with me." However, the victim's mother refused to reconcile. The Petitioner said he later pled "no contest" in Oklahoma to charges related to sexually abusing the victim and received a two-year sentence to be served on unsupervised probation.

The Petitioner testified that trial counsel began representing him in this case in 2009 and was appointed on arraignment day. The Petitioner and trial counsel met "[i]n the back there for a few minutes" at his arraignment, and trial counsel told him about an offer from the State. However, the Petitioner told trial counsel that he was not going to accept any offers. The Petitioner said that he turned down the State's offer because he "didn't do anything" and that "I made the mistake about pleading no contest in Oklahoma. I wasn't going to make that mistake again." The Petitioner said that trial counsel met with him in jail only one time before trial and that the meeting occurred three days before trial. The Petitioner wrote thirty-six letters to trial counsel, and trial counsel responded three times. They never spoke on the telephone. The Petitioner said that he and trial counsel "really didn't do anything" to prepare for trial and that trial counsel did not think the jury could convict him. The Petitioner went to trial in September 2010 and had been in custody more than six years at the time of the post-conviction hearing.

The Petitioner testified that he and trial counsel talked briefly in court about whether he should testify and that trial counsel advised him not to testify. Trial counsel told the Petitioner that "it was obvious [the victim] was lying, because the things she said [the Petitioner] did to her here was totally different from what she said in Oklahoma, that [the Petitioner] did to her here." Trial counsel told him that "there was no way that [the jury] would be able to convict because [the] stories didn't match up." Trial counsel told the Petitioner that he was going to "bring that out, ask her which story she was going with today," and the Petitioner followed trial counsel's advice not to testify. They talked again about whether the Petitioner should testify after the State presented its proof. Trial counsel told the Petitioner that "he knew, by watching Judge Watkins that he knew that they were lying, there was no sense in [the Petitioner] testifying." Again, the Petitioner relied on trial counsel's advice and decided not to testify. The Petititioner said he had no legal training and did not finish the ninth grade in school.

The Petitioner testified that trial counsel told him that trial counsel's daughter was going to have a baby "any moment," that it would take one or two days just to pick a jury, and that trial counsel may need to ask for a continuance "unless we had a bench trial and be over in one day." The Petitioner was supposed to give trial counsel an answer about the bench trial on the morning of trial, and everyone in jail told the Petitioner not to have a bench trial. However, when the Petitioner walked into court on the morning of trial, "it was [already] set for a bench trial." The Petitioner did not sign any waiver or have any conversation with Judge Watkins or trial counsel about waiving his right to a jury trial. He said he did not think he would have been convicted if he had had a jury trial.

The Petitioner testified that trial counsel never prepared him to testify or went over potential cross-examination with him and that he would have disputed Betty Sue Blalock's testimony if he had testified. The Petitioner never talked with trial counsel about having witnesses testify on his behalf. The Petitioner told trial counsel that the victim's allegations were "impossible" because she claimed he picked her up from school every day. However, the victim's mother had signed "a paper" prohibiting anyone from picking up the victim from school because the victim's mother was afraid her ex-husband would come and get her children. Post-conviction counsel asked where the Petitioner worked from 1996 to 1999, and the Petitioner said he "started working for Rock City Mechanical . . . and then Hardaway Construction." The Petitioner acknowledged that he worked for Hardaway Construction from 1997 to 1999 and said that he could not leave work to pick up the victim. He said he never picked her up from school or any after-school program because he worked until 5:30 or 6:00 p.m. every day.

The Petitioner testified that he told trial counsel that the victim's mother "lies a lot about everything" and that "it would all come out" if trial counsel could get the victim's mother on the stand. The Petitioner denied trying to bribe the victim's mother not to reveal the abuse and said she never expressed any concerns about his relationship with her children. In 2003, the Petitioner and two brothers of the victim's mother left Oklahoma and went to work in North Dakota. From there, the Petitioner went to a permanent job in Ohio.

On cross-examination, the Petitioner acknowledged that he never complained about trial counsel's representation until he filed his petition for post-conviction relief. He acknowledged that the victim's mother testified truthfully at trial about some things.

Harold Cole Goodrum, Jr., testified that he was a concrete contractor and that the Petitioner worked for him at East Bank Contractors "many years ago." Post-conviction counsel asked him, "Would that be sometime in the mid to late '90's? Does that sound about the right time period?" He answered, "Probably. Probably." He described the Petitioner's work hours as follows:

Some days were normal hours. Some days varied. It depends -- it's like a plumber on call. Some days there were regular hours. Some days they weren't. They were irregular hours.

. . . .

We had enough work where, most of the time, everyone would show up at six-thirty in the morning. Some days -- again, it depends on the work load. Some days it was a regular day six-thirty to four, six-thirty to three-thirty. Some days we had a lot -- we performed a lot of work at night. So, there were some days, I'd say twenty to thirty percent of the time we performed work at irregular hours, meaning after four o'clock or before six-thirty in the morning.

On cross-examination, Goodrum acknowledged that he did not have any records of the Petitioner's work hours. He never visited the Petitioner's home when the Petitioner lived in Nashville.

In a written order, the post-conviction court denied the petition for post-conviction relief. Regarding the Petitioner's having a bench trial, the court accredited trial counsel's testimony that he and the Petitioner discussed whether the Petitioner wanted to proceed with a bench trial or a jury trial and that the Petitioner chose a bench trial "because he felt that he would have a fairer opportunity with a bench trial than a jury trial." Regarding the Petitioner's not testifying at trial, the court accredited trial counsel's testimony that the Petitioner indicated he did not want to testify; "therefore he was not counseled on testifying." As to Harold Goodrum's testimony, the post-conviction court noted that Goodrum did not have any employment records for the Petitioner and that Goodrum testified the Petitioner's "hours worked varied." The court found that trial counsel had extensive experience in criminal defense, counseled the Petitioner about the nature of the charges and the defense, and communicated his trial strategy to the Petitioner. The court specifically found the Petitioner not credible and stated that he had failed to demonstrate he received the ineffective assistance of trial counsel. On appeal, the Petitioner challenges the post-conviction court's denial of the petition.

## II. Analysis

To be successful in a claim for post-conviction relief, a petitioner must prove the factual allegations contained in the post-conviction petition by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). "'Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" State v. Holder, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999) (quoting Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.3 (Tenn.

1992)). Issues regarding the credibility of witnesses, the weight and value to be accorded their testimony, and the factual questions raised by the evidence adduced at trial are to be resolved by the post-conviction court as the trier of fact. See Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). Therefore, the post-conviction court's findings of fact are entitled to substantial deference on appeal unless the evidence preponderates against those findings. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001).

A claim of ineffective assistance of counsel is a mixed question of law and fact. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999). We will review the post-conviction court's findings of fact de novo with a presumption that those findings are correct. See Fields, 40 S.W.3d at 458. However, we will review the post-conviction court's conclusions of law purely de novo. Id.

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, "the petitioner [usually] bears the burden of proving both that counsel's performance was deficient and that the deficiency prejudiced the defense." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)). To establish deficient performance, the petitioner must show that counsel's performance was below "the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). To establish prejudice, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. Generally, [b]ecause a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component. Goad, 938 S.W.2d at 370 (citing Strickland, 466 U.S. at 697).

In Cronic, though, the United States Supreme Court identified three scenarios involving the right to counsel where the situation was "so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." United States v. Cronic, 466 U.S. 648, 658-60 (1984). Under such circumstances, an irrebuttable presumption of prejudice exists, and the petitioner need not meet the elements of Strickland to prove ineffective assistance of counsel. Id. at 662. These three scenarios are: (1) situations involving "the complete denial of counsel," where the accused is denied the presence of counsel at "a critical stage" in the proceedings; (2) situations where "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing"; and (3) situations where "counsel is available to assist the accused during trial, [but] the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial." Id. at 659-60; see also Berry v. State, 366 S.W.3d 160,

- 12 -

174 (Tenn. Crim. App. 2011).

### A. Ineffective Assistance of Counsel under Cronic

First, the Petitioner contends that we should presume prejudice in this case under the standard set forth in Cronic rather than the traditional standard announced in Strickland. He argues that his claim of ineffective assistance of counsel fits within the first scenario identified in Cronic because he was "constructively denied counsel during the critical pre-trial stages." He also contends in his reply brief, without any explanation, that his claim fits within the second scenario that counsel entirely failed to subject the State's case to meaningful adversarial testing.

Initially, we note that the Petitioner did not argue in the post-conviction court that he was entitled to relief under Cronic. See Tenn. R. App. P. 36(a). However, given that the existence of any of the scenarios in Cronic results in per se reversible error, we will address his claims. See Tenn. R. App. P. 36(b).

The jail log shows that trial counsel met with the Petitioner one time and that the meeting lasted forty-five minutes. The Petitioner testified that trial counsel also met with him in the back of the courtroom on the day of his arraignment. The Petitioner said that trial counsel communicated a plea offer by the State during the meeting and that he told trial counsel he would not accept any offers. Trial counsel testified, and the Petitioner confirmed, that they met additional times when the Petitioner appeared in court. The Petitioner said that he wrote numerous letters to trial counsel but that counsel responded only three times. Trial counsel testified, and the Petitioner again confirmed, that he spoke with the Petitioner about having a jury trial or a bench trial and whether the Petitioner should testify.

Moreover, trial counsel testified that he received discovery materials from the State and that he obtained a transcript of the victim's Oklahoma interview. Our review of the trial transcript supports counsel's claim that he received the transcript of the interview. During the victim's interview with an Oklahoma detective, she stated that the Petitioner ejaculated in her mouth. The detective then asked her, "When did this start?" The victim answered, "[I]n the second grade." She also said the family lived in Nashville. On cross-examination at trial, trial counsel asked the victim if she told the detective that the Petitioner ejaculated in Nashville, and she said no. Trial counsel then asked, "So it would surprise you if there was a transcript where you said, yes, he did ejaculate?" The victim answered, "I guess so."

The Petitioner argues that this case is similar to Mitchell v. Mason, 325 F.3d 732 (6th Cir. 2003), in which the Sixth Circuit held that the petitioner was entitled to relief under Cronic. However, the facts in the present case are quite distinguishable from the facts in Mitchell. In Mitchell, trial counsel met with the petitioner, who had been charged

with first degree murder, for a total of six minutes and was suspended from the practice of law for the last month of the seven-month pretrial period. 325 F.3d at 742. Additionally, the petitioner repeatedly requested new counsel before trial. Id. at 735. In analyzing whether the petitioner was entitled to relief, the Sixth Circuit Court of Appeals concluded, "When counsel is appointed but never consults with his client and is suspended from practicing law for the month preceding trial, and the court acquiesces in this constructive denial of counsel by ignoring the defendant's repeated requests for assistance, Cronic governs." Id. at 744. Such is certainly not the case here, and we conclude that the Petitioner was not completely denied counsel during the pretrial period.

Regarding the Petitioner's claim that trial counsel entirely failed to subject the State's case to meaningful adversarial testing, the United States Supreme Court has stated that "the attorney's failure must be complete" in that "'counsel entirely fails to subject the prosecution's case to meaningful adversarial testing.'" Bell v. Cone, 535 U.S. 685, 697 (2002) (quoting Cronic, 466 U.S. at 659). In the instant case, the State filed a pretrial motion pursuant to Tennessee Rule of Evidence 404(b), stating that it intended to elicit testimony about the sexual conduct perpetrated by the Petitioner on the victim after the family moved back to Oklahoma. On the morning of trial, the trial court held a hearing on the motion, and trial counsel objected to testimony about the Oklahoma abuse on the basis that the abuse in Oklahoma differed from the abuse in Nashville and that the testimony would be unfairly prejudicial. He also objected to Betty Sue Blalock's testimony during opening statements and again before she testified. During the State's direct examination of its witnesses, trial counsel objected approximately ten times, sometimes successfully. He cross-examined the victim and her mother, moved for a judgment of acquittal after the State's proof, made an opening statement, and gave a closing argument. Thus, we cannot conclude that trial counsel completely failed to test the prosecutor's case during the guilt phase of the trial. Accordingly, the Strickland standard applies to the Petitioner's claims of ineffective assistance of counsel.

## B. Ineffective Assistance under Strickland

The Petitioner contends that the post-conviction court erred by denying his petition for post-conviction relief because trial counsel was ineffective for failing to meet with him before trial to discuss all possible defenses, including whether he should testify and waive his right to a jury trial; for failing to have him personally relinquish his right to a jury trial in open court; for failing to investigate all possible defenses, such as whether his work schedule would have contradicted the victim's allegations; for failing to contact women the victim allegedly told about the abuse; for failing to obtain receipts for money sent by the Petitioner to the victim's mother to show she was biased against him; for failing to talk with Oklahoma police to verify the victim's mother's anticipated trial testimony; for failing to request Brady and Jencks material after every witness testified; and for failing to cross-examine key witnesses about critical discrepancies in their testimony and prior inconsistent statements. The State argues that the Petitioner has

failed to show he received the ineffective assistance of counsel. We disagree with the State.

Regarding the Petitioner's claim that counsel failed to meet with him before trial to discuss all possible defenses, the post-conviction court did not specifically address the discrepancy between the jail log, which showed that trial counsel met with the Petitioner only one time in jail just four days before trial, and trial counsel's claim that he met with the Petitioner more than one time in jail. However, the post-conviction court found the Petitioner not credible and that trial counsel communicated adequately with the Petitioner. Trial counsel testified that the Petitioner did not think the Petitioner was present for all of the incidents alleged by the victim. Trial counsel said that he could not remember if he obtained the Petitioner's employment records but that, in any event, the victim was "so general" about when the offenses occurred, he could not prove the Petitioner was out of town. Therefore, trial counsel's strategy was to point out inconsistencies in the victim's stories. The Petitioner was aware of that strategy, testifying that trial counsel told him that it was obvious the victim was lying and that trial counsel was going to "bring that out, ask her which story she was going with today." Thus, while not condoning trial counsel's meeting with the Petitioner only one time in jail before trial, we conclude that the Petitioner has failed to show that counsel was ineffective for failing to meet with him to discuss all possible defenses.

Regarding the Petitioner's claim that trial counsel failed to communicate with him adequately regarding his right to a jury trial, trial counsel testified that he would have told the Petitioner about his right to a jury trial and about the "pros and cons" of having a bench trial. He said that the Petitioner thought Judge Watkins was more likely than a jury to remember that the standard for conviction was beyond a reasonable doubt and that he agreed with the Petitioner. Although the Petitioner testified at the evidentiary hearing that the decision to have a bench trial already had been made for him when he came to court on the morning of trial and that he never waived his right to a jury trial, the trial record refutes his testimony. A written waiver of the Petitioner's right to a jury trial, signed by the Petitioner, trial counsel, the State, and the trial court on the day of trial, is in the technical record. Furthermore, the Petitioner's waiver comports with Tennessee Rule of Criminal Procedure 23(b), which addresses a defendant's waiver of a trial by jury. Thus, the Petitioner has failed to show that he is entitled to post-conviction relief on this claim.

Regarding the Petitioner's claim that trial counsel failed to communicate with him adequately regarding his right to testify, trial counsel testified that he did not think the Petitioner would make a good witness, that the Petitioner was "certain" he did not need to testify, and that it was the Petitioner's decision not to testify. The Petitioner himself testified that trial counsel advised him twice not to testify and that he took counsel's advice. We note that the trial court held a Momon hearing in which trial counsel asked the Petitioner if they had discussed "the pros and cons of testifying and not testifying," if

- 15 -

the Petitioner had made a voluntary decision not to testify, and if the Petitioner was making the decision "of your own free will." The Petitioner answered yes to all three questions. He also signed a written waiver of his right to testify. Accordingly, we again conclude that he has failed to show that he is entitled to post-conviction relief.

Next, the Petitioner contends that trial counsel was ineffective for failing to investigate all possible defenses, such as whether the Petitioner's work schedule would have contradicted the victim's allegations, and that interviewing his employer or obtaining his employment records was "critical to his defense." At trial, the victim's mother testified that she worked until 5:00 or 5:30 p.m. every day and that the Petitioner "would get off earlier than that, so the responsibility of picking up the kids fell on him." She acknowledged that he worked out of town sometimes but said that he was never out of town overnight and always returned in time to pick up the children. She said that when she got home most evenings, the Petitioner and the victim were home alone. The victim testified that the first incident of abuse occurred after the Petitioner picked her up from "kind of like an after-school program" and that the abuse occurred "[a]lmost every day." The victim did not specify when the second and third incidents occurred but said the second incident occurred in the bathroom and that the third incident occurred in the bedroom while other family members were present in the apartment.

At the evidentiary hearing, the Petitioner testified that he worked for Hardaway Construction when the alleged abuse occurred, that he never picked up the victim from school or after-school, and that he told trial counsel that the victim's allegations were "impossible." Trial counsel testified that he would have obtained and used the Petitioner's employment records "if they [had] indicated he was working out of town during that time period that she claims these things happened." Trial counsel did not say, and post-conviction counsel did not ask, whether the employment records could have shown that the Petitioner did not have the opportunity to pick up the victim in the afternoons. Instead, post-conviction counsel called Harold Goodrum to testify. However, Goodrum could not remember exactly when the Petitioner worked for him. In fact, Goodrum said the Petitioner worked for him at East Bank Contractors, not Hardaway Construction. In any event, Goodrum stated that a "regular day" meant working from 6:30 a.m. to 3:30 or 4:00 p.m. and that his employees worked "after four o'clock or before six-thirty in the morning" twenty to thirty percent of the time. Therefore, his testimony would not have been particularly helpful to impeach the victim's mother's testimony and would not have provided the Petitioner with an alibi for any of the three offenses elected by the State. Accordingly, the Petitioner has failed to show that trial counsel was deficient for failing to obtain his employment records or that he was prejudiced by any deficiency.

The Petitioner also contends that trial counsel should have contacted the women

that the victim claimed she told about the abuse.[2]   However, he failed to call the witnesses to testify at the post-conviction hearing.  Generally, "[w]hen a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing."  Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990).  The Petitioner also argues that trial counsel failed "to verify and obtain receipts for money sent by the Defendant to the victim's mother to show bias, motive, and/or malicious intent on the part of [the victim's mother] once the Defendant stopped sending her funds."  At trial, the victim's mother testified that the Petitioner sent her money after they separated, "[t]rying to get [her] to come back to him."  At the evidentiary hearing, the Petitioner confirmed that he sent her money in an attempt to reconcile.  However, he failed to present any evidence at the hearing to show that the timing of the victim's allegations coincided with his no longer sending money to the victim's mother.  Therefore, the Petitioner has failed to show that trial counsel was ineffective for failing to obtain receipts for money sent by the Petitioner to the victim's mother.

The Petitioner also claims that trial counsel should have talked with Oklahoma police to verify the victim's mother's anticipated testimony and should have requested Brady and Jencks material for every witness at trial.  However, the Petitioner has failed to explain how speaking with the Oklahoma police or obtaining the material would have changed the outcome of the trial.  Therefore, we again conclude that he has failed to show that he is entitled to relief.

Finally, the Petitioner asserts that trial counsel was ineffective for failing to cross-examine the victim and her mother about critical discrepancies and prior inconsistent statements.  In support of his argument, he gives the following examples:  (1) the victim testified at the preliminary hearing in Oklahoma that she disclosed the abuse to her mother for "'a little while,' [maybe] an hour" and testified at trial in Nashville that they would have discussed specific details, but her mother testified at trial that their conversation lasted about five minutes and that the victim did not give her any specific details; (2) the victim testified at the preliminary hearing in Oklahoma that she never confronted the Petitioner with the allegations, but she testified at trial in Nashville that she confronted him; (3) the victim testified at trial in Nashville that the Petitioner abused her almost every day, but she told Detective Black that he abused her every week; (4) the victim testified at trial in Nashville that her family was present during an incident of abuse, but she did not mention that incident to Detective Black; (5) the victim's mother testified that the Petitioner offered her money if she would not reveal the allegations, but she never claimed in Oklahoma that he tried to bribe her; and (6) the victim's mother testified at trial in Nashville that the victim made the allegations after she picked up the victim from school, but the victim testified at the preliminary hearing in Oklahoma that

---

[2] During her interview with the Oklahoma detective, the victim said she told her three best friends in the sixth grade.

she told her mother in the summertime. The Petitioner also asserts that counsel should have pointed out these inconsistencies during his closing argument.

Initially, we note that two of the discrepancies alleged by the Petitioner are not discrepancies at all. Regarding the first example above in which the Petitioner claims that the victim testified at trial that she and her mother discussed the details of the abuse while her mother testified that they did not, the victim clarified on cross-examination at trial that she "didn't go into detail" with her mother about the abuse. Regarding the sixth example above in which the Petitioner claims that the victim testified at the preliminary hearing in Oklahoma that she told her mother about the abuse in the summertime while her mother testified at trial that the victim told her after school, the victim went on to clarify on cross-examination at the preliminary hearing in Oklahoma that she revealed the abuse to her mother after her mother "had just picked me up from school. . . . [W]e only had half a day because we had just started back to school." Moreover, our review of trial counsel's closing argument reveals that he argued that the victim's testimony about whether she discussed the details of the abuse with her mother was inconsistent with her mother's testimony.

That said, though, we agree with the Petitioner that there were inconsistencies or discrepancies in the remaining examples, that trial counsel failed to question the witnesses about them, and that counsel failed to mention them during closing argument.

At the post-conviction evidentiary hearing, trial counsel testified that the defense's strategy was to point out the victim's inconsistencies. Yet, the only question that trial counsel asked the victim regarding a prior inconsistent statement was whether she told the Oklahoma detective that the Petitioner ejaculated in Nashville when she testified at trial that he did not ejaculate in Nashville. Moreover, trial counsel never cross-examined the victim or her mother about the victim's years-long delay in reporting the abuse or the fact that her mother waited nine months to report the abuse to Oklahoma police. Trial counsel also did not question the victim's mother about her claim that the Petitioner tried to bribe her not to reveal the abuse even though nothing indicates that the victim's mother ever told law enforcement in Oklahoma or Tennessee about the alleged bribe. Trial counsel's cross-examination of the victim and her mother consisted mostly of brief leading questions rehashing their direct examination testimony. Therefore, we are compelled to conclude that trial counsel was deficient for failing to conduct an effective cross-examination of the victim and her mother.

We note that trial counsel completely failed to cross-examine the State's remaining two witnesses, Blalock and Detective Black. Blalock testified on direct examination about the Petitioner's and the victim's going into his bedroom to take a nap, which she thought was "[v]ery odd." However, she did not testify about witnessing any act of abuse. As to Detective Black, the officer testified on direct examination about problems with her investigation of the case. Specifically, the file she obtained from the

Oklahoma police contained only "some type of incident report," a summary that was less than one page, and a videotape of the victim's forensic interview. Detective Black talked with the victim and the victim's mother but acknowledged that their memories of the events in Nashville were "faded and fuzzy" and that the victim's recollection about what happened to her in Nashville was not nearly as detailed and extensive as her recollection about what happened to her in Oklahoma. Yet, trial counsel made no attempt to cross-examine either Blalock or Detective Black. Regardless, the Petitioner did not question trial counsel at the evidentiary hearing about his decision not to cross-examine the witnesses. Accordingly, it must be presumed that counsel's decision was trial strategy. Strickland, 466 U.S. at 689.

Regarding prejudice, this was a "she-said he-said" case in which the victim's testimony was crucial to the State's case. Trial counsel even acknowledged at the evidentiary hearing that his job at trial was to create doubt in the victim's credibility. Counsel made very little attempt, though, to discredit the victim or her mother despite numerous opportunities to do so. Therefore, we must conclude that the Petitioner was prejudiced by trial counsel's deficient performance.

### III.  Conclusion

Based upon the oral arguments, the record, and the parties' briefs, we conclude that the Petitioner received the ineffective assistance of trial counsel under Strickland. Therefore, the judgment of the post-conviction court is reversed, the judgments of conviction are vacated, and the case is remanded for further proceedings consistent with this opinion.

_____
NORMA MCGEE OGLE, JUDGE

- 19 -